UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHY HALL,

       Plaintiff,

v.

CITY OF DEARBORN,

       Defendant.

Case No. 20-10198
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT [16]**

---

For more than two decades, Cathy Hall has worked for the City of Dearborn, rotating through three departments. She currently works as an office coordinator for the Department of Property Maintenance and Development Services. In 2017, a co-worker became her direct supervisor. Hall says her new supervisor began harassing her daily by commenting on and staring at her breasts and making sexual comments toward her. Hall first complained about the harassment to the City in November 2018, and the City looked into her complaints. Though the City took action in response to Hall's complaints, including removing her supervisor, the alleged harassment did not stop. And Hall claims she was told to stop reporting harassment to the City, unless *she* wanted to be investigated for harassing her former supervisor.

So Hall filed this lawsuit, alleging that the City created and maintained a hostile work environment and retaliated against her for complaining about her harassment. The City now seeks summary judgment for both the hostile work

environment and retaliation claims. Having thoroughly reviewed the summary-judgment record, the Court will GRANT IN PART and DENY IN PART the City's motion for summary judgment for the reasons set out below.

## I.

### A.

Because the City seeks summary judgment, the following factual summary is based on reading the record in the light most favorable to Hall. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Hall has worked for the City of Dearborn since 1997, and as of July 2021, continues to do so. (ECF No. 16, PageID.91.) Hall is classified as an Office Coordinator III for the Department of Property Maintenance and Development Services, meaning she performs various administrative tasks for the City, including tracking and coordinating permits. (*See* ECF No. 16-24, PageID.478.) Hall has also previously worked for the Department of Economic and Community Development and the Department of the City Clerk. (ECF No. 16-7, PageID.341.) On June 20, 2018, the City denied Hall's reclassification request, which would have placed her as Office Coordinator IV.

In 2017, John Connolly, a building inspector for the City, became Hall's supervisor. (ECF No. 16-2, PageID.127.) Hall claims that Connolly started harassing her on a daily basis. (*Id.*) Connolly would comment on Hall's cross necklace as an excuse to stare at Hall's breasts. (*Id.* at PageID.126.) On one occasion, Connolly asked Hall whether she was having a "going-away party" for her breasts after she told

2

Connolly she needed to have breast-reduction surgery. (*Id*.) Hall also asserts that Connolly used swear words when speaking to her and, during the pandemic, commented on the number of people in the building, which she claims contributed to the hostile work environment. (*See* ECF No. 16-2, PageID.165, 167.)

Hall made her first complaint to the City about Connolly on November 8, 2018. The day after the 2018 Congressional and state elections, Connolly told Hall that he heard she was working the "poles," specifically spelling out "poles" to imply that Hall was working as a stripper. (*Id*.) Hall complained about this comment to the City's Human Resources Department and Cynthia Pepper, the HR Administrator for the City. (ECF No. 16-3, PageID.220, 224.) Hall told Pepper that Connolly and another employee had been laughing about Hall working the "poles." (*Id*. at PageID.224–225.) Hall also told Pepper that Connolly would make comments about her cross and stare at her breasts. (*Id*. at PageID.232.)

In response to Hall's November 8 complaint, Pepper asked Connolly to discuss what happened. (*Id*. at PageID.225.) Connolly offered to apologize to Hall, and Hall confirms that he did. (*Id*.; ECF No. 16-2, PageID.158.) But the record is not clear as to whether Connolly admitted to making the "poles" comment or not. (*See* ECF No. 16-3, PageID.225–226; ECF No. 16-6, PageID.137.) In addition to the verbal apology, Pepper told Connolly that he "cannot make comments like that" and "to make sure that they don't talk like that." (ECF No. 16-3, PageID.226.)

Following-up on the November 8 complaint, Hall's union representative, Mark Moriarty, requested information and investigative notes from HR. (ECF No. 16-18,

PageID.464.) Pepper told Moriarty that no documentation of Connolly's apology existed and that investigative notes are not shared. (*Id.*) Moriarty then advised Hall to not contact HR, and to instead document and inform the union about Connolly's behavior. (*Id.*)

Hall had another issue with Connolly's behavior shortly after the November 8 complaint. On November 15, Hall was sitting in her cubicle while Connolly and Ken Foley, the Chief Building Official, were having a conversation about a new program in an open area nearby. (ECF No. 16-3, PageID.229.) During that conversation, Hall heard and saw Connolly make a masturbation motion. (*Id.*) Per Moriarty's advice, Hall reported Connolly's harassment to the union, and Moriarty forwarded the complaint to Pepper. (*Id.* at PageID.228.)

Pepper again initiated an investigation into Hall's complaint, first by interviewing both Connolly and Foley about the incident. (*Id.* at PageID.230.) Both men denied that it happened. (*Id.*) Pepper then spoke with Hall, who indicated that there may be video evidence of the incident. (*Id.*) Pepper reviewed the video and did not see Connolly make the complained-of motion. (*Id.* at PageID.231.) So Pepper concluded that there was no support for Hall's allegations, closed the investigation, and told Hall that the investigation was closed due to lack of corroboration. (*Id.*) Hall asked to see the video evidence, but the tape was already destroyed per normal City processes. (*Id.* at PageID.231–232.)

On November 29, the City required all employees to attend a mandatory training session on the City's anti-harassment policy. (ECF No. 16-20, PageID.468.)

The City's actions could be related to Hall's complaints because, according to Hall, she had never attended any similar training during her many years with the City. (ECF No. 16-2, PageID.159.) The record does not indicate whether Connolly attended. (*See id.*)

After a seemingly quiet December, in January 2019, Hall requested that HR place her on the transfer list to "get away from" Connolly. (*Id.* at PageID.161.) Indeed, Hall called HR and complained that she and Connolly were having communication problems and that she "wasn't comfortable" with him as her supervisor. (ECF No.16-3, PageID.235.) But twelve days later, Hall advised HR that she was withdrawing her name from the transfer list. (ECF No. 16-22, PageID.472.) Hall states that she withdrew her name from the list because, between her initial request and withdrawal, she became aware that Connolly had written her a "negative" performance review. (ECF No. 16-2, PageID.161.) Connolly, however, completed the performance review several months before in May 2018. (*Id.* at PageID.166.)

Nevertheless, the City decided that Ken Foley would be reassigned as Hall's supervisor. (ECF No. 16-3, PageID.236.) Nick Siroskey, who is the Director of the Property Maintenance and Development Services Department, made the decision to remove Connolly as Hall's supervisor. (ECF No. 16-23, PageID.474.)

But Hall claims Connolly's harassment did not stop. A few days after the City reassigned Hall to Foley, Hall reported Connolly to HR for a third time. (ECF No.16-3, PageID.240.) Hall recalls Connolly asking her whether she had candles and blankets in her car in a way that suggested he was asking whether she had "romantic"

things in the car for an "escapade." (ECF No. 16-2, PageID.165.) And Hall recalls Connolly asking her "did your husband's pipes freeze?" (*Id.*) But it is not clear what exactly Hall reported to HR. Pepper recalls Hall reporting that Connolly had asked her whether she had blankets in the car for safety reasons because of the polar vortex. (ECF No. 16-3, PageID.241.) Further, Pepper testified that Hall added the candles part of the comment after her initial report. (*Id.*) Pepper also states that Connolly's question about Hall's husband's pipes was never reported. (ECF No. 16-3, PageID.242.)

Pepper spoke to Hall about the third complaint, discussed the context of the comment, and concluded that Connolly was only asking out of concern for other employees. (ECF No. 16-3, PageID.242.) Pepper and Hall also discussed how to interpret Connolly's comments and how Connolly may feel harassed by Hall reporting him to HR. (ECF No. 16-3, PagID.244.) Hall says that HR told her "they were not going to take these incidents seriously" and to "not come back again with anything regarding [Connolly] because it could be construed as you starting to harass him." (ECF No. 16-2, PageID.165.) Hall claims that Connolly's harassment did not stop after her January 2019 complaint, but she stopped reporting the behavior because of HR's response to her last complaint. (ECF No. 16-2, PageID.164.)

In September 2019, several months after her reports, Hall had another issue with Connolly. (ECF No.16-2, PageID.125.) Foley and Siroskey met with Hall and suggested moving her desk away from the front counter, thus limiting interactions with Connolly. (*See id*. at PageID.125; ECF No. 16-4, PageID.289.) At an October 1,

2019 meeting with HR and Foley, Hall's desk was once again moved at her request so she could be in an area visible by the video cameras in case Connolly harassed her again. (ECF No. 16-2, PageID.125.) At the same meeting, Foley told Hall that she would be focusing on special projects for larger permit applicants, such as Ford. (*Id.* at PageID.139, 163; ECF No. 16-4, PageID.266.) The Ford land project to which Foley assigned Hall is a "two billion dollar renovation going on in the City," which Foley described as "important" to the department. (ECF No. 16-4, PageID.276–277.)

B.

Hall filed this lawsuit in January 2020 after filing a complaint with the EEOC and receiving a right-to-sue letter. (*See* ECF No. 1.) Hall complains that the City is responsible for creating and maintaining a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act (Count I) and that she was subject to retaliation for her sexual harassment complaints, also in violation of Title VII and ELCRA (Count II). (*Id.* at PageID.12–16.)

Following discovery, the City's motion for summary judgment is now before the Court. (ECF No. 16.)

II.

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment requires the court to view all evidence in the light most favorable to the nonmoving

7

party and is appropriate only if the evidence in the record is so one-sided that no reasonable jury could find for that party. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 339 (6th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)).

## III.

The Court begins with Hall's claim that the City is liable for maintaining a hostile work environment under Title VII.

To establish a hostile-work-environment claim under Title VII, Hall must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable. *Doe v. City of Detroit, Michigan*, 3 F.4th 294, 300 (6th Cir. 2021). The City contests only the last three elements of Hall's claim. The Court will combine its analysis of whether the harassment was based on sex and whether the harassment created a hostile work environment, as the City does in its brief, and then turn to whether the City is liable.

## A.

The parties dispute whether Hall has shown that the alleged harassment created a hostile work environment and whether some of this harassment was sex-based.

A hostile work environment is defined as a workplace "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or

8

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *See Strickland v. City of Detroit*, 995 F.3d 495, 505 (6th Cir. 2021) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The Court considers the "totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Id.* Specifically, a court must consider the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered[d] with an employee's performance." *Id.* at 506. "[S]exual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive." *Hawkins*, 517 F.3d at 333. "[W]hether harassment was so severe and pervasive as to constitute a hostile work environment" is "'quintessentially a question of fact.'" *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) (quoting *Jordan v. City of Cleveland,* 464 F.3d 584, 597 (6th Cir. 2006)).

In evaluating the totality of the circumstances, the Court agrees with the City that some of the comments Hall alleges are sexual harassment are not actionable. For example, Connolly made a comment to Hall regarding there being too many people in a public building during the current COVID-19 pandemic. (ECF No. 16-2, PageID.165.) Hall also testified that Connolly would use swear words when speaking to her or giving her directions. (*Id.* at PageID.167.) There is no evidence that these comments or language were directed at Hall because of her sex or were sex-specific in any way. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009) ("In other words, even non-sexual harassing conduct may be deemed based

on sex if the plaintiff is otherwise able to show that, but for the fact of her sex, she would not have been the object of harassment."). Therefore, the Court will not consider these comments in its analysis of the hostile work environment claim.

But even removing these comments from consideration, a reasonable jury could still find that Hall was subject to pervasive harassment. Hall testified that Connolly made "daily" comments about her cross necklace "anytime he saw" her as an excuse to stare at her breasts. (ECF No. 16-2, PageID.126; *see* ECF No. 16-3 PageID.232.) Hall's assertion that this harassment took place every day starting in 2017 is sufficient to establish a genuine issue of fact as to whether the environment was objectively hostile. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 568 (6th Cir. 2021) ("If true [that plaintiff testified that she was harassed daily], that fact would likely be sufficient to show that the environment at Great Lakes was objectively hostile." (citing *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (focusing on the "plaintiff's assertion that [harassing comments] were commonplace, ongoing, and continual" in finding that a reasonable jury could conclude that harassment was severe or pervasive))).

The City argues that Connolly's comments about Hall's cross cannot be severe or pervasive because others, such as Pepper, describe the cross as one that "draws a person's eyes" and as "very shiny, big and shiny." (ECF No. 16-3, PageID.233.) But even if true, a jury could still credit Hall's testimony that the cross was an excuse for Connolly to stare at her breasts. And a reasonable jury may also conclude that even if the cross draws one's attention initially, daily comments about it are not

10

appropriate and are made with a sexual purpose. The City also argues that comments on the cross should not be deemed sexual merely because the cross was located on Hall's chest. (ECF No. 16, PageID.105.) But Connolly did more: he would stare at Hall's breasts while commenting on the cross. (ECF No. 16-2, PageID.126; ECF No. 16-3 PageID.232.) Therefore, the Court will consider Connolly staring at Hall's breasts on a daily basis as part of its hostile work environment analysis.

And beyond Connolly using Hall's cross necklace to look at her breasts, Hall details a number of other harassing comments that further suggest that the environment was hostile. There is evidence that Connolly asked Hall whether she and her husband are "going to have a going-away party" for her breasts after Hall informed him that she may need to have breast-reduction surgery. (ECF No. 16-2, PageID.126.) On another occasion, Connolly told Hall that she was working the "p-o-l-e-s" when she returned from helping the City with Election Day tasks. (*Id.*; ECF No. 16-3, PageID.225.) And at a different time, Connolly asked Hall whether she had candles and blankets in her car in a way that suggested he was asking whether she had a "little escapade out in your car for us[.]" (ECF No. 16-2, PageID.165.) Hall also testified that Connolly would "box me in my cubicle where I felt threatened and my blood pressure would raise." (*Id.* at PageID.127.) Taken together with the daily staring at Hall's breasts, a reasonable jury could find that the harassment was pervasive. *See Meadows v. Wahler Auto Sys., Inc.*, 45 F.Supp.3d 645, 656 (E.D. Mich. 2014) (holding that the alleged actions, which included plaintiff's supervisor harassing her on a daily basis by commenting on her body and brushing up against

her breasts, were enough to require a fact finder to determine whether the harassment was severe or pervasive).

The City argues that the question about Hall having blankets in her car was not directed toward Hall, so it cannot have been made because of her sex. (ECF No. 16, PageID.104.) But harassing comments need not be directed at Hall to be considered as part of her hostile work environment claim. *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998). In any event, Hall testified that Connolly directed that comment to her, and that is what she told HR. (ECF No. 16-2, PageID.165; ECF No. 16-3, PageID.241.) And, at summary judgment, the Court takes as true Hall's account.

The City also contends that the question was posed out of concern for Hall due to the "polar vortex" that was occurring at the time. (*See* ECF No. 16-3, PageID.234.) And it disputes whether Connolly asked about candles or just blankets. (*See id.* at PageID.241–242.) But, again, the Court must view the evidence in the light most favorable to Hall. And with that view, the blankets-and-candles comment was made to Hall with romantic implications and would not have been made but-for her sex.

Also pertinent to whether the harassment was severe or pervasive is whether it unreasonably interfered with Hall's performance. There is evidence that it did. Hall testified that she left work or called in sick on multiple occasions because of Connolly's comments causing her blood pressure to rise. (*See* ECF No. 16-2, PageID.131.) Hall would sometimes leave right after an interaction with Connolly because of her blood pressure. (ECF No. 16-3, PageID.241.) This evidence adds to the

12

severity of Connolly's conduct, and at the very least, shows that Hall subjectively regarded the environment as abusive. *See Thornton v. Federal Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).

In sum, there is a genuine dispute of material fact as to whether Hall experienced severe or pervasive harassment, which created a hostile work environment.

### B.

The City next argues that Hall cannot raise a genuine dispute of material fact as to whether the City, as the employer, should be held liable for the hostile work environment.

The Court first clarifies the applicable standards. In the Sixth Circuit, the standard for employer liability under Title VII depends on the harasser's role in the workplace. In cases where the plaintiff alleges harassment by a coworker, the employer is only liable "if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Doe*, 3 F.4th at 301 (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005)). But in cases where a supervisor is the alleged harasser, the employer is vicariously liable for the hostile work environment if there is a "tangible employment action," such as termination or demotion. *Gallagher*, 567 F.3d at 275. If no tangible employment action has been taken, then an employer may avoid liability if it establishes that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" by the supervisor and that "the plaintiff unreasonably

failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Since it is undisputed that Connolly was both Hall's supervisor and later her coworker during the alleged harassment (ECF No. 16-2, PageID.138), the Court considers the City's liability under both frameworks for Title VII.

1.

Starting with supervisor liability, the City has not met its burden.

One way an employer can show it exercised reasonable care to prevent and correct sexually harassing behavior is if it has promulgated and enforced an effective sexual harassment policy. *See Thornton*, 530 F.3d at 456; *Wyatt v. Nissan North America, Inc.*, 999 F.3d 400, 414 (6th Cir. 2021) ("The first element involves evaluating whether [employer] had a 'reasonable sexual harassment policy' and whether such policy 'was effective in practice.'"). "Though an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 685 (6th Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *but compare Quinn v. Griffith*, 515 F. App'x 543, 547–48 (6th Cir. 2013) (holding that an employer may defend against liability for a Title VII claim even absent an anti-harassment policy)).

On the current record, the City cannot avoid liability using this route. Neither party has provided the Court with the City's sexual harassment policy. And without

14

the sexual harassment policy, the Court cannot conduct the typical analysis to determine whether the policy is reasonable. *See Wyatt*, 999 F.3d at 414; *Sanford v. Main Street Baptist Church Manor, Inc.*, 327 F. App'x 587, 596 (6th Cir. 2009) (evaluating employer's sexual harassment policy).

Further, the evidence of record concerning the City's sexual harassment policy raises issues of material fact as to its effectiveness and implementation. "[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." *Clark,* 400 F.3d at 349–50. The record shows that the City's policy has some of these qualities. Pepper testified that employees can talk to their supervisor, their supervisor's supervisor, come directly to HR, or call a 24-hour hotline with complaints. (ECF No. 16-3, PageID.221–222.) Supervisors can also go to human resources if they get a complaint, though it is not clear if the policy requires them to do so. (*See id.* at PageID.222.) So the policy meets many of the factors discussed above.

But on the other hand, Hall testified that the sexual harassment policy was never distributed directly to employees, at least during the years preceding Connolly's harassment. (ECF No. 16-2, PageID.160.) A policy must be communicated to be effective. *See Faragher*, 524 U.S. at 808–09 (holding employer had not exercised reasonable care in part because "the city had entirely failed to disseminate its policy against sexual harassment" among the relevant employees). And the only evidence of

general sexual harassment training was the training required at the end of November 2018, which, according to Hall, is the first training she remembers in her many years with the City. (ECF No. 16-20, PageID.468; ECF No. 16-2, PageID.159.) The Court found nothing in the record rebutting this testimony. So there is a genuine dispute of material fact as to whether the City's sexual harassment policy is adequate to show that the City exercised reasonable care in preventing sexual harassment.

Even with promulgation of a reasonable anti-harassment policy, the City must also show that "the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Shields v. Fed. Exp. Customer Info. Servs. Inc.*, 499 F. App'x 473, 479 (6th Cir. 2012); *Wyatt*, 999 F.3d 400, 414. Hall argues that the City's policy was not effective in correcting Connolly's harassment because the City did not take remedial actions after Hall reported the harassment and because Connolly's harassment continued. (ECF No. 19, PageID.497–498.)

A reasonable jury could agree with Hall on this point. After the first report, the City promptly investigated Hall's claims. Had that put an end to Connolly's behavior, the City would probably not be liable. *See Wathen v. General Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997) (affirming grant of summary judgment when employer's "response put an end to the behavior of which [plaintiff] complained."). But Hall says Connolly did not stop. Indeed, the day after the City issued its findings regarding the November 8, 2018 complaint, Hall made another report to the City about Connolly making a lewd sexual gesture. (ECF No. 16-3, PageID.228.) Then, in January 2019, Hall asked for a transfer "to get away from John Connolly." (ECF No. 16-2, PageID.161.) Even

16

though the City decided to have Hall report to Foley instead of Connolly, Hall reported yet another incident of harassment to HR. (*Id.* at PageID.165; ECF No. 16-3, PageID.240–242.) Hall says that HR then told her "they were not going to take these incidents seriously" and to "not come back again with anything regarding [Connolly] because it could be construed as you starting to harass him." (ECF No. 16-2, PageID.165.) Hall claims that Connolly's harassment did not stop after her January 2019 complaint, but she stopped reporting the behavior because of HR's response to her last complaint. (ECF No. 16-2, PageID.164.) On these facts, a reasonable jury could conclude that the City's response was not effective in stopping Connolly's behavior toward Hall.

And there is a genuine dispute of fact as to whether the City reasonably responded after Hall's November 8, 2018 complaint about Connolly's "poles" remark. An employer that takes "affirmative steps reasonably calculated to prevent and put an end to a pattern of harassment—such as personally counseling harassers, sending them letters emphasizing the company's policies and the seriousness of the allegations against them, and threatening harassers with serious discipline if future allegations are substantiated—are more likely to be deemed to have responded appropriately." *Hawkins*, 517 F.3d at 342–43. True, in response to Hall's complaint, Connolly apologized, was "told that you cannot make comments like that," and told to "make sure that they don't talk like that again." (ECF No. 16-3, PageID.226.) But the City did not require Connolly to do anything specific. Even the verbal apology was voluntary. (*Id.* ("Mr. Connolly offered to apologize, which he did.").) There is no

17

evidence that Connolly was specifically referred to and trained on the City's sexual harassment policy in response to the complaint or warned of future disciplinary consequences if he were to continue making such comments. In fact, the record does not show whether Connolly even attended the general sexual harassment training the City required at the end of November 2018.

The record also does not clearly establish whether the City addressed Hall's allegation that Connolly would use Hall's cross as an excuse to stare at her breasts. Although Connolly testifies that it was addressed, he does not specify what was said to remediate those actions. (ECF No. 16-6, PageID.320.) And Pepper does not mention any remedial actions the City required when discussing the actions HR took after Hall complained. (*See* ECF No. 16-3, PageID.226.) So a reasonable jury could find that if the City failed to address the cross comments specifically with Connolly, it did not take reasonable steps to correct the complained-of harassment.

In all, the City has not met its burden of showing that every jury would find that following the November 8 report, it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Gallagher*, 567 F.3d at 275.

And even if the City made reasonable efforts to stop Connolly's behavior, to meet the harassing-supervisor standard, it would still need to show that Hall "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Gallagher*, 567 F.3d at 275.

A reasonable jury could find that Hall took advantage of the opportunities the City provided. As the City points out, it is true that Hall did not report any harassment to the City until November 8, 2018, though Hall claims Connolly's harassment started in 2017. (*See* ECF No. 16-2, PageID.166.) So the City cannot be held liable for failing to take actions to prevent and correct sexual harassment before the November 8 complaint. But it is also undisputed that Hall reported Connolly's harassment to HR three times within the span of three months. So the record does not show that Hall failed to take advantage of "any" of the preventative or corrective opportunities provided by the City. Hall also testified that her union representative told her after her first complaint that she should stop making complaints to HR and instead, document the harassment from Connolly and inform the union. (ECF No. 16-2, PageID.159; ECF No. 16-18, PageID.464.) A reasonable jury could find the union's advice explains why Hall did not make any reports from November 16 to January 29, and that following this advice was reasonable. So the City has not shown that every reasonable jury would find that Hall unreasonably failed to take advantage of the City's procedures.

Hall has therefore shown a genuine dispute of material fact regarding whether the City is liable for Connolly's harassment as Hall's supervisor under Title VII.

### 2.

The Court now turns to the City's Title VII liability for Connolly's harassment as Hall's coworker. To establish liability under the coworker-harassment standard,

Hall must show that the employer knew or should have known about the harassment and failed to act. *Doe*, 3 F.4th at 301.

The City first argues that two harassing comments in particular were not reported to the City. The first was Connolly's comment asking whether Hall was going to have a going away party for her breasts in August 2018. (ECF No. 16-2, PageID.126.) The Court agrees that there is scant evidence that this comment was reported to HR. But since it was made in August 2018 when Connolly was Hall's supervisor, the Court does not apply the "knew or should have known" standard to this comment. It is instead evaluated per the standard used for supervisor harassment, and as discussed above, a reasonable jury could find that the City has not established its affirmative defense.

The City also argues that the question Connolly posed about whether Hall's husband's pipes froze was not reported to HR, and Pepper and Foley both confirm this. (*See* ECF No. 16-3, PageID.242; ECF No. 16-4, PageID.272.) But Hall testified that she emailed HR and Foley, her then-supervisor, about this comment. (ECF No. 16-2, PageID.169.) The Court may not decide whose testimony is more credible. Instead, it must view the evidence in the light most favorable to Hall. So the Court concludes that there is a genuine issue of material fact as to whether the City knew or should have known about the pipes comment, and will not dismiss it from the Title VII hostile-work-environment claim at this time.

The only remaining incident subject to the coworker harassment standard is Connolly asking if Hall has blankets and candles in her car. But the City does not

20

discuss this incident or its response to it when contesting employer liability in its brief. And there is evidence that at least the blankets part of the comment was reported to Pepper, and Pepper discussed the comment with Hall, but took no remedial action. (ECF No. 16-3, PageID.240–242.) So the Court finds that there is a genuine dispute of material fact as to whether the City knew or should have known about this comment and failed to respond appropriately.

In sum, there are genuine disputes of material facts such that Hall's Title VII hostile work environment claim will not be dismissed. But, as explained above, certain comments are not actionable and cannot form the basis of Hall's claim moving forward.

## IV.

The Court turns to Hall's hostile-work-environment claim under ELCRA, which requires Hall to show the same elements as Title VII. *See Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020).

## A.

The Court first considers whether the harassment Hall suffered constitutes a hostile work environment. ELCRA hostile-work-environment claims have similar elements as Title VII hostile-work environment claims and thus require a similar analysis. *Khalaf*, 973 F.3d at 482; *see also Wasek v. Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012). As established above, a reasonable jury could find that Hall suffered severe or pervasive harassment while working for the City. Thus, Hall's

21

claim survives summary judgment on the issue of whether her harassment constitutes a hostile work environment.

B.

The Court next considers the City's liability under ELCRA. Unlike Title VII where there are different standards for coworker and supervisor harassment, the Michigan Supreme Court has held that under ELCRA "prompt and appropriate remedial action will permit an employer to avoid liability if the plaintiff accuses either a co-worker or a supervisor of sexual harassment." *Radtke v. Everett*, 501 N.W.2d 155, 168–69 (Mich. 1993); *see also Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 917–18 (Mich. 2000) (rejecting the U.S. Supreme Court's *Faragher-Ellerth* interpretation of Title VII in establishing employer affirmative defense to supervisor harassment claims). So under Michigan law, Hall must show that a reasonable jury could find that the City did not take "prompt and appropriate remedial action" in response to her complaints about Connolly.

To recap, Hall complained to the City three times: on November 8 about the "p-o-l-e-s" comment and Connolly staring at her breasts, on November 16 about Connolly making a masturbation gesture, and on January 29 about Connolly asking her about candles and blankets. The Court considers the City's response to each complaint in turn.

The Court agrees with the City that based on the undisputed facts, it acted promptly and appropriately following Hall's November 16 complaint regarding Connolly making a "masturbation" gesture. The City reviewed Hall's complaint and,

22

shortly after, met with Connolly and asked him about the incident. (ECF No.16-3, PageID.230.) Connolly denied making such a gesture. (*Id.*; ECF No. 16-6, PageID.325.) Foley also told Pepper that Connolly did not make such a gesture. (ECF No. 16-3, PageID.230; ECF No. 16-4, PageID.269.) And Pepper testified that she viewed video evidence that confirmed that Connolly did not make such a gesture. (ECF No. 16-3, PageID.231; ECF No. 16-19, PageID.466.) The evidence of record overwhelmingly suggests that the City's response was adequate. After conducting an investigation where she interviewed all witnesses and checked the video camera, Pepper concluded there was no basis for Hall's allegation. Given this reasonable conclusion, no further steps needed to be taken. Hall therefore cannot recover on a hostile-work-environment claim under ELCRA based on this incident.[1]

But, as explained above, there is a genuine dispute of material fact as to whether the City took appropriate remedial action following Hall's November 8 complaint. And the City does not address the steps it took after Hall's January 29 complaint in its briefs. But Hall testified that when discussing the January 29 complaint, HR told her that if she continued to make complaints about Connolly, she would be the one investigated for harassment. (ECF No. 16-2, PageID.165.) Viewing

---

[1] The Court notes that different state and federal standards lead to different results here. Though the City would also meet its burden of showing "reasonable care to prevent and correct promptly any sexually harassing behavior" under Title VII for this incident, it still could not show that that every reasonable jury would find that Hall "unreasonably failed to take advantage of any preventative or corrective opportunities" it provided.

this in the light most favorable to Hall, a reasonable jury could find that the City did not respond appropriately to that complaint.

Hall's ELCRA claim will not be dismissed, but will only be allowed to proceed on the incidents underlying the November 8, 2018 and January 29, 2019 complaints.

## C.

The Court next turns to Hall's Title VII and ELCRA retaliation claims. The parties only discuss the evidence supporting Hall's *prima facie* case for retaliation. So the Court focuses on only those elements. But the Court notes that the *McDonnell Douglas* framework typically used in employment discrimination cases also applies to Hall's retaliation claims. *See Taylor*, 703 F.3d at 336.

To establish a *prima facie* Title VII claim for retaliation, Hall must show that she (1) engaged in a protected activity; (2) the City knew of such protected activity; (3) thereafter, the City took an action that was materially adverse to Hall; and (4) a causal connection existed between the protected activity and the materially adverse action. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). The City contests the last two elements of Hall's retaliation claim under Title VII and ELCRA.

The Court analyzes Hall's Title VII and ELCRA claims together as the standards for materiality and causation are similar. Under Title VII, a materially-adverse action is one that dissuades a reasonable worker from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Michigan Court of Appeals adopted the same standard for

materiality under ELCRA. *See White v. Dep't of Transportation*, 964 N.W.2d 88, 99 (2020).

For causation, the standard under Title VII is but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). The causation standard under ELCRA is a bit unclear, but it seems as if but-for causation applies there as well. Even after the Supreme Court's decision in *Nassar*, the Michigan Court of Appeals has continued to state that retaliation claims under ELCRA require a plaintiff to show that the protected conduct was a "significant factor" in the adverse action. *See e.g., Cadoura v. Flat Rock Fire Dep't*, No. 353618, 2021 WL 4238119, at *7 (Mich. Ct. App. Sept. 16, 2021). But the origin of this "significant factor" language is the Michigan Court of Appeals' decision in *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001), which in turn relied on the Sixth Circuit opinions in *Jacklyn* and *Polk*. But, as the Sixth Circuit recently noted, "Since *Jacklyn* and *Polk*, this court has found that the causation element of Title VII and the ELCRA are the same." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 349 n.5 (6th Cir. 2021); *see also Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 n.9 (6th Cir. 2019). Accordingly, and having not been provided anything to the contrary from the parties, the Court finds that to prevail under ELCRA, Hall must meet the but-for standard. *See Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014) (reasoning that Michigan courts would interpret ELCRA to require but-for causation).

25

There are three actions Hall claims the City took that were materially adverse and were the result of her complaints to the City about Connolly's behavior: issuing a negative performance review, taking away some of Hall's job duties, and telling her that she would be investigated for harassment if she continued to report Connolly's harassment.

The Court first addresses whether Connolly's 2018 performance review of Hall can be considered retaliation. The City argues that it cannot, and the Court agrees. Connolly completed the performance review in May 2018, six months before Hall made her first complaint to HR. Logically, Hall's protected activity cannot cause a negative performance review if the performance review was completed before Hall ever complained. (*See* ECF No. 16-2, PageID.166.) Further, Hall does not address the City's performance review argument in her response brief, and therefore forfeits any argument in support of it being retaliatory. So Hall may not proceed with a retaliation claim based on her 2018 performance review.

Next, Hall argues that she had regular job duties taken away and was placed in a less favorable position by being assigned to exclusively handle requests related to the Ford land renovation project. (ECF No. 19, PageID.510.) Specifically, Hall argues that no one asked her if she wanted to move to the Ford land renovation project and Hall wanted to complete her "regular job" instead. (*Id.*)

But Hall offers no explanation as to why this means the Ford land renovation project is *materially* adverse, meaning that it would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Burlington*, 548 U.S. at

26

68. At most, the evidence shows that the new project was a change in duties, but not necessarily one that was negative at all, let alone negative enough to dissuade a reasonable worker from reporting harassment. Hall stated that Foley, who decided to assign her exclusively to the Ford project, told her that she was moved because she is "detail-oriented" and knows how to keep track of all the permits. (ECF No. 16-2, PageID.139.) Pepper confirms that the Ford project is a "very significant financial and economic and development concern here." (ECF No. 16-3, PageID.248.) Foley also testified that the Ford Project was "more important" to the department and that it needed to run smoothly. (ECF No. 16-4, PageID.277.) There is no evidence of record indicating that moving Hall to the Ford project was an adverse action, and certainly not one that would affect an employee's decision to report harassment.

Additionally, there is a tenuous causal connection between Hall's protected conduct and her move to the Ford project. The decision to move Hall to the Ford project was communicated to her in October 2019, more than seven months after her last complaint to HR. (*See* ECF 16-2, PageID.163.) Hall therefore may not proceed with a retaliation claim based on her assignment to the Ford project.

Hall also claims that the City retaliated by "threatening to turn the tables on her" and stating that Connolly could accuse her of harassment if she continued to complain about him. (ECF No. 19, PageID.510.) Hall states she stopped reporting harassment to HR for this reason. (ECF No. 16-2, PageID.164.) The City does not address this incident in its reply brief. Pepper testified, however, that though she did not tell Hall that she would consider it harassment if Hall continued to report

27

Connolly, she did have a conversation with Hall about how Connolly "was feeling harassed." (ECF No. 16-3, PageID.244.)

The Court concludes that, viewing this evidence in the best light for Hall, Pepper telling Hall she could be investigated for harassment if she continued to report Connolly could be considered a materially adverse action. A reasonable employee would likely reconsider reporting or supporting a claim of harassment if they would be investigated as a harasser in response. Such an action, if true, would be "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Halfacre v. Home Depot*, 221 F. App'x 424, 432 (6th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). The Court notes that the City's action in telling Hall she would be subject to investigation if she continued filing complaints may not be materially adverse in all circumstances. *See Burlington*, 548 U.S. at 69 ("an act that would be immaterial in some situations is material in others.") For example, if an employee incessantly files complaints that are found to be uncorroborated or without merit, the employee would not have a claim for retaliation. But the City does not argue that the facts here are as extreme. In fact, the City does not address Hall's argument about this statement at all in its reply. So the Court holds that a reasonable jury could find the City's action materially adverse based on the record before it.

And the timing of this conversation is sufficient to show "that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *See Taylor v. Geithner*, 703 F.3d 328, 339

(6th Cir. 2013). Hall testified that the conversation took place in February 2019, in response to her January 29, 2019 complaint about Connolly. (*See* ECF No. 16-2, PageID.164.) And since this was communicated to Hall in a conversation about her complaints in general, the evidence gives rise to the inference that the action was caused by Hall's complaints.

So Hall may proceed with her retaliation claim under ELCRA and Title VII, but only based on the City telling her she would be investigated for harassment if she continued to report Connolly.

### V.

For the reasons stated, a reasonable jury could find for Hall on both her hostile work environment and retaliation claims. But Hall may proceed with these claims based on only certain underlying actions. So the City's motion for summary judgment (ECF No. 16) is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated: October 19, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE